**FIFTH THIRD BANK OF WESTERN OHIO, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 95–503C.**

United States Court of Federal Claims.

June 12, 2003.

Alan M. Grimaldi, Washington, DC, for plaintiff, with whom was Robert M. Bruskin, Robert H. Cox, Timothy K. Armstrong, Alexander B. Berger, and Jennifer R. Bagosy, Howrey Simon, Arnold & White, LLP. Tina Woods, Fifth Third Bank of Western Ohio, Dayton, OH, of counsel.

David A. Levitt, Washington, DC, for defendant, with whom was Deputy Assistant Attorney General Stuart E. Schiffer. Brian A. Mizoguchi, Jr., Jonathan S. Lawlor, John H. Roberson, and Gregory R. Firehock, Department of Justice, of counsel.

## OPINION

MILLER, Judge.

At the conclusion of plaintiff's case-in-chief, defendant moved for judgment on partial findings in its favor, pursuant to RCFC 52(c). The court denied the motion as to damages, but granted judgment for defendant on liability.

The court was advised that this was the first trial on liability in a *Winstar* case. Plaintiff's case on liability, and the Government's scrutiny of it under cross-examination, illuminated the difficulty of proving the elements of express or implied-in-fact contracts that allegedly were formed over 20 years ago based on testimony at trial, testimony by deposition, and routine documents submitted to and generated by a government agency.

## PROCEDURAL HISTORY

This is a *Winstar* case. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("*Winstar III*").[1] Fifth Third Bank of Western Ohio[2] ("plaintiff") filed its original complaint on August 4, 1995, alleging breach of contract and a taking for which compensation was due with regard to transactions with five Ohio thrifts that took place during the 1980's.

This case was assigned to this court on January 11, 2002, after completion of discovery. On April 12, 2002, the court declined to grant either party's cross-motion for summary judgment on liability. *See generally*

1. After issuing a decision on liability, *Winstar Corp. v. United States,* 25 Cl.Ct. 541 (1992) ("*Winstar I*"), *Winstar Corp. v. United States,* No. 90–8C, *Statesman Savings Holding Corp. v. United States,* No. 90–773C, and *Glendale Federal Bank, FSB v. United States,* No. 90–772C, were consolidated for appeal. *See Statesman Sav. Holding Corp. v. United States,* 26 Cl.Ct. 904, 924 (1992). The Federal Circuit affirmed the trial court's findings on liability. *See Winstar Corp. v. United States,* 994 F.2d 797 (Fed.Cir.1993), *rev'd en banc,* 64 F.3d 1531 (Fed.Cir.1995) ("*Winstar II*"). The Supreme Court granted *certiorari.*

2. Citizens Federal Bank, FSB, merged into plaintiff on August 14, 1998. This opinion refers to "Citizens" and "plaintiff" interchangeably.

*Fifth Third Bank of Western Ohio v. United States,* 52 Fed.Cl. 264 (2002) (*"Fifth Third I"*). On June 12, 2002, the court ruled that officials of the Cincinnati office of the Federal Home Loan Bank Board ("FHLB–Cincinnati") had implied actual authority to enter into the goodwill contracts at issue. *See generally Fifth Third Bank of Western Ohio v. United States,* 52 Fed.Cl. 637 (2002) (*"Fifth Third II"*). On July 12, 2002, the court ruled that plaintiff's claims for breach of contract and a taking with regard to its merger with Sentry Savings and Loan Company did not relate back to plaintiff's original claims for purposes of satisfying the applicable statute of limitations. *See generally Fifth Third Bank of Western Ohio v. United States,* 52 Fed.Cl. 829 (2002) (*"Fifth Third III"*).

On February 10, 2003, after argument, the court granted defendant's summary judgment motion with regard to expectancy damages both in the form of lost profits and on the theory of cover; restitution calculated on the basis of net liabilities assumed by the thrift and calculated from the Government's historic cost in dealing with failing thrifts; and reliance damages based on net liabilities assumed by the thrift. The court denied the motion with regard to plaintiff's claim for simple breach damages arising from the sale of plaintiff's Cincinnati division and with regard to lost proceeds caused by the allegedly premature conversion of plaintiff from mutual to stock form. *See generally Fifth Third Bank of Western Ohio v. United States,* 55 Fed.Cl. 223 (2003) (*"Fifth Third IV"*). Following the last dispositive motion, the case proceeded to trial.

## FACTS

The facts in this case are also discussed in *Fifth Third I, II, III* and *IV*. For the purposes of this opinion, the court briefly discusses the undisputed background and, pursuant to RCFC 52(c), makes the salient findings of fact related to liability based on oral and deposition testimony and documentary evidence submitted at trial. Unlike a summary judgment proceeding, the posture of the court's prior decisions, RCFC 52(c) allows the court to weigh evidence introduced by plaintiff against that elicited by defendant on cross-examination and to make credibility findings.

This lawsuit arises out of what has come to be known as the savings and loan crisis of the late 1970's and early 1980's. The Supreme Court has described this imbroglio and the Government's attendant responses in considerable detail. *See Winstar III,* 518 U.S. at 844–58, 116 S.Ct. 2432. The crisis was caused by inflation and rising interest rates, which eroded the earnings of many thrifts with loan portfolios consisting, in large part, of low-interest, fixed-rate long-term mortgages. As interest rates increased, short-term deposit accounts became more costly, but the earnings derived from long-term mortgages remained constant. The result was a deterioration in thrift earnings, the increased inability to meet federal capital reserve requirements, and the prospect of industry-wide crises. Indeed, many thrifts failed in the early 1980's, depleting funds held by the Federal Savings and Loan Insurance Corporation ("FSLIC"). FSLIC insured depositors' accounts up to a capped amount in certain savings institutions and also enforced compliance by such institutions with various regulatory requirements designed to safeguard the deposit insurance fund. *Winstar III,* 518 U.S. at 844, 116 S.Ct. 2432.

The Federal Home Loan Bank Board ("FHLBB" or the "Bank Board") in Washington, DC, also was charged with regulating federally chartered savings and loan associations and savings banks and enforced regulations against the institutions. It acted as the operating head of FSLIC and approved acquisitions, mergers, and other transactions between thrifts. *Winstar III,* 518 U.S. at 844, 116 S.Ct. 2432.

The Government worked through FHLBB and its regional offices to minimize FSLIC's exposure. As the Supreme Court described: "Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of 'supervisory mergers.'" *Winstar III,* 518 U.S. at 847, 116 S.Ct. 2432.

"[T]he principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations." *Winstar III*, 518 U.S. at 848, 116 S.Ct. 2432. The Government permitted acquiring thrifts to account for supervisory transactions using the "purchase method" of accounting, whereby acquired assets and liabilities were revalued at their market values instead of at book value (a process known as "marking to market"). The purchase method also allowed the acquiring thrift to recognize the excess of the purchase price over the value of the net liabilities acquired as an intangible asset called "supervisory goodwill." The Government allowed the amount of resulting goodwill to count toward the thrift's regulatory capital requirement and to amortize it over an extended period of time. In some cases the Government granted forbearances with respect to enforcement of certain otherwise applicable regulatory requirements.

In 1989 Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which, *inter alia,* eliminated the use of supervisory. goodwill as a means of satisfying capital requirements. *See generally* Pub.L. No. 101–73, 103 Stat. 183. FIRREA also changed the regulatory structure governing thrift institutions. The act abolished FSLIC and designated the Federal Deposit Insurance Corporation (the "FDIC") as the successor to FSLIC for the purposes of this action. The FDIC was the backup regulator and insurer of Citizens beginning on the effective date of FIRREA. FIRREA created the Office of Thrift Supervision (the "OTS"), which succeeded FHLBB's supervisory function.

Plaintiff is headquartered in Dayton, Ohio, and is a division of Fifth Third Bancorp. Fifth Third Bancorp is a diversified financial services company headquartered in Cincinnati, Ohio. It operates 16 affiliates in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, and West Virginia. It provides a broad spectrum of products and services through four primary businesses: commercial banking, retail banking, investment advisory, and Midwest payment system. With $71 billion in assets, plaintiff, as of January 2003, was the fourteenth-largest bank holding company in the nation and the ninth-largest in market capitalization. In 1998 plaintiff acquired Citizens and became the successor-in-interest to Citizens' claims in this case. *See* Order filed Oct. 1, 1998 (granting motion for substitution of transferee).

Citizens was organized in 1934 as a federally chartered mutual savings and loan association headquartered in Dayton, Ohio. From its founding until its conversion to a stock institution on January 29, 1992, Citizens operated as a mutual institution. Citizens was a "community-oriented" financial institution with operations primarily in the Dayton area. Pl.'s Br. filed Jan. 6, 2003, at 7. As a thrift, Citizens' primary business was raising deposits from the general public and using those deposits to fund home mortgages.

According to Jerry L. Kirby, President and Chief Executive Officer ("CEO") of Citizens for 25 years, Citizens in the 1970's and 1980's held a commanding share of the deposit market in the Dayton area. In the late 1970's, Citizens' deposits amounted to 13 percent of the Dayton deposit market, but growth at that time began to stagnate so that Citizens was unable to continue to increase its business with any regularity. Mr. Kirby testified that he went to Citizens' board of directors in 1980 and suggested that, if the thrift institution was to continue to grow, it must expand outside the Dayton market. He recommended to the board that Citizens look at other economies in central and southwestern Ohio and, in particular, the cities of Columbus and Cincinnati.

In 1984 Citizens also began expanding its product lines. In that year Citizens became only the second savings and loan in the country to receive the approval of FHLBB to open a trust department. Citizens also considered expanding into automobile loans and credit card accounts. According to Mr. Kirby, these actions were part of a business plan to make Citizens more bank-like than thrift-like, by offering more product lines than merely deposit accounts and home mortgages.

Between 1982 and 1985, Citizens entered into six transactions with four failing thrifts in southern Ohio.[3] The four pertinent transactions include the April 30, 1982 branch acquisition of Cardinal Federal Savings and Loan Association ("Cardinal"); the March 1, 1983 branch acquisition of Gateway Federal Savings and Loan Association ("Gateway"); the March 1, 1984 merger with Homestead Federal Savings and Loan Association ("Homestead"); and the August 1, 1985 merger with First Federal Savings and Loan Association ("First Federal"). Citizens also completed two additional transactions that are not the subject of this suit. Those transactions are the January 31, 1984 merger with Sentry Savings and Loan Company and the August 5, 1985 acquisition of the Chillicothe branch office of Freedom Federal Savings and Loan Association.

Each acquisition or merger fit into Citizens' business plan of expanding geographically and diversifying its product lines. Citizens' acquisition of the southern division of Cardinal gave Citizens an entry into the Cincinnati market. The Gateway acquisition brought Citizens into Warren and Clinton counties, just south of Dayton, Ohio. At the time of its acquisition by Citizens, Homestead already was offering credit card accounts. After Citizens acquired Homestead, those accounts, according to Mr. Kirby, "grew quite rapidly." Transcript of Proceedings, *Fifth Third Bank of Western Ohio v. United States,* No. 95–503C, at 267 (Fed.Cl. Mar. 10–26, 2003) ("Tr."). Finally, the First Federal acquisition brought two offices into Citizens which were located in the western part of Cincinnati in Hamilton county.

Even though all four target institutions were failing at the time of their acquisition by Citizens, Citizens' assets grew to $2 billion between 1982 and 1985 as a result of the transactions. In 1986 Citizens had record earnings of $20.4 million. Mr. Kirby attributed Citizens' success to "good business management and a fine board of directors." Tr. at 270.

The savings and loan industry in the late 1970's and early 1980's was weak. Mr. Kirby noted that at the time of the Cardinal acqui-

sition: "Well, I remember full well that the ... month that we acquired [Cardinal], interest rates on mortgage loans were 16.5 percent. There weren't many buyers." Tr. at 271. Interest rates had a negative spread at that time; interest-earning assets like mortgages were making less money than interest-paying liabilities, such as deposit accounts. To hedge its risk, Mr. Kirby testified that Citizens had a policy that it would not extend mortgages for terms longer than 20 years, rather than offer higher risk 25–or 30–year loans.

In 1981 FHLBB invited Mr. Kirby to a conference in Washington, DC. FHLBB Chairman Richard Pratt and General Counsel Thomas Vartanian told the invitees that they had been asked to attend because FHLBB had identified their institutions as healthy thrifts. Mr. Kirby recalled that FHLBB representatives had expressed their intention to help the savings and loan industry "get rid of the failing or failed thrifts." Tr. at 275. Lawrence B. Muldoon, Supervisory Agent at FHLB–Cincinnati, and William L. McElheney, Assistant Vice President of Industrial Development at FHLB–Cincinnati, also attended the meeting. Plaintiff argues that each of the four transactions at issue were part of the Government's nationwide policy to pair healthy thrifts with unhealthy thrifts, in an effort to preserve FSLIC funds.

Each of these four transactions followed the same general pattern. In each case FHLB–Cincinnati, through Jerry Summers, Assistant Vice President in charge of the FHLB–Cincinnati supervisory function and Mr. Muldoon's subordinate, had identified the target savings and loan institutions as failing thrifts. FHLB–Cincinnati found merger candidates that would take over the troubled thrift, and Mr. Muldoon recommended thrifts as merger partners.

FHLB–Cincinnati, through Mr. Muldoon or Mr. McElheney, contacted Citizens and proposed the supervisory merger. The presidents of the merging institutions agreed to the merger and signed either a Purchase Agreement or a Merger Agreement. The

---

**3.** *Fifth Third I,* 52 Fed.Cl. at 265–69, describes these transactions in detail.

institutions then submitted an application for merger to FHLB–Cincinnati, which included a pro forma statement of each institution's financial condition, recording the amount of goodwill expected from each transaction. As part of the application, an independent accountant's letter was also submitted, affirming that the type of accounting to be used was appropriate and in accordance with generally accepted accounting principles ("GAAP"). All four transactions were booked under the purchase method of accounting, which generated supervisory goodwill, and all four were so-called "supervisory mergers." Instead of FSLIC's providing a direct infusion of money to facilitate the transaction, FHLB–Cincinnati and FHLBB approved the transaction under the purchase method of accounting with the other stipulations summarized above.

Charles L. Thiemann, President and Principal Supervisory Agent of FHLB–Cincinnati, whose deposition testimony was admitted over defendant's objection, testified that Mr. Muldoon had "full authority" to recommend mergers and that Mr. Thiemann signed off on Mr. Muldoon's recommendations. Dep. of Charles L. Thiemann, July 26, 2000, at 26–27 ("Thiemann Dep."). FHLBB, however, was the "ultimate authority" on approving mergers and acquisitions in the thrift industry. *Id.*

FHLB–Cincinnati conditionally approved all four transactions. All four conditional approvals were expressed in Bank Board Resolutions, which contained conditions precedent to the obligation of Citizens to consummate the merger or acquisition, including requiring the approval of FHLBB and other regulatory agencies. Each Resolution used the same approval language:

> IT IS THEREFORE RESOLVED, that under the authority delegated to me as Principal Supervisory Agent of the Federal Home Loan Bank Board, the application of Citizens Federal Savings and Loan Association of Dayton, Ohio, to increase its accounts of an insurable type by reason of the proposed acquisition of [the target institution] ... is hereby approved ... provided that the following provisions of this Resolution are complied with ....

*See, e.g.,* Bank Board Resolution V–O–M–82–7, Apr. 30, 1982, at 1 (conditionally approving Cardinal acquisition). Each Resolution included provisions imposing certain obligations on the thrifts. The provisions required Citizens, prior to consummating the acquisition, to furnish an opinion letter from an independent accountant that indicated the justification under GAAP for the use of purchase method accounting, specifically described any goodwill arising from the transaction, and substantiated the reasonableness and amounts of such goodwill and the related amortization period. *See, e.g., id.* at 2.

Each Resolution further required Citizens to furnish, within 30 days of the acquisition's effective date: an opinion from local counsel stating the effective date of the acquisition and confirming that it was consummated in accordance with the Purchase Agreement; a statement of the financial condition of Citizens and closing statement of the target institution as of the effective date of the acquisition; and a letter signed by the CEO of each institution confirming that, as of the effective date of the acquisition, no adverse change had occurred in the condition or operation of their respective institutions and that the acquisition had been consummated consistent with the pro forma statement of condition or, if not, noting what changes had occurred.

After each transaction Citizens sent FHLBB a letter certifying that the purchase was consummated in accordance with the Purchase Agreement· or Merger Agreement and with the pro forma statement of condition contained in the Application for Purchase or Merger. Citizens also submitted the requisite accountant's letter stating that the purchase method was appropriate for the transaction.

FHLB–Cincinnati then reviewed all the documents and submitted each proposed acquisition to FHLBB for final approval. FHLBB reviewed and approved all four transactions. FHLB–Cincinnati then communicated to Citizens' president that the transaction was satisfactory to meet the conditions set out in the Resolution and that no further approval was necessary. Subsequent FHLBB examination reports noted the

amount of recorded goodwill on Citizens' books resulting from the transaction, as well as the amortization period. *See, e.g.,* FHLBB Report of Examination, Oct. 22, 1983, at 2.1 (noting that Citizens' merger with Cardinal generated $38 million in goodwill, to be amortized over 30 years).

### 1. *Cardinal*

Citizens acquired 13 Cincinnati branches through the transaction with Cardinal Federal Savings and Loan Association ("Cardinal"). An internal FHLBB memorandum dated March 1, 1982, noted that Cardinal's net worth had deteriorated "to the point where insolvency could occur by August 1982"—five months after the date of the memorandum. The document notes that Cardinal "[m]anagement has been urged to seek a merger partner. However, Cardinal's size has made this search difficult." Mr. Thiemann viewed Citizens as a suitable merger partner because Citizens was a "strong, very viable institution in an environment where we had a lot of sick ones." Thiemann Dep. at 106.

Mr. Kirby testified for more than three days. His testimony is crucial to plaintiff's claim that Citizens has contracts with the Government, whereby the Government allowed Citizens to use goodwill towards its capital requirements, amortizing it over a given period of years, in exchange for plaintiff's merging with failing institutions. The court found Mr. Kirby to be an admirable incantation of the American dream, rising from bank teller to President and CEO in under 25 years. Mr. Kirby was earnest and testified to the best of his recollection, which was distilled into a few memories of long conversations with bank regulators. He could relate the substance of conversations, but his testimony suffered from rote constancy regarding the four transactions at issue. The court had a unique opportunity to evaluate this lay witness. Although he is a gentleman and person of integrity, Mr. Kirby could not carry plaintiff's case.

Mr. Kirby testified that the Cardinal transaction was initiated when Mr. McElheney contacted Citizens. At plaintiff's request over defendant's opposition, Mr. McElheney's deposition also was admitted at trial. During early March 1982, Mr. McElheney contacted someone at Citizens—and the court finds that it was Hazel L. Eichelberger, Senior Vice President of Retail Branch Operations during the relevant period—and informed her that Cardinal was experiencing financial trouble and was a candidate for merger. Specifically, he probed Citizens' interest in acquiring some branch offices in Cincinnati. Cardinal had proposed to FHLB–Cincinnati that it sell branches in two divisions. Sale of whole banks was the norm in the 1980's and what Mr. Kirby would have preferred. The selling of branches was a "new concept" for FHLB–Cincinnati, according to Mr. McElheney. Dep. of William L. McElheney, July 27, 2000, at 131 ("McElheney Dep.").

Mr. McElheney also contacted several other institutions to seek a buyer for Cardinal; indeed, several of the contacted institutions submitted bids. Cardinal decided which of those bids to accept, according to Mr. McElheney. Cardinal ultimately selected Citizens. Ms. Eichelberger testified that Mr. McElheney told her that FHLBB would agree to allow Citizens to book the negative net worth of Cardinal's Cincinnati division as goodwill, which, Mr. McElheney explained, would count as an asset for regulatory capital purposes and could be amortized over an extended period of time. According to Ms. Eichelberger, whose recollection of events was shaky, the opportunity to purchase Cardinal's southern division presented a good growth opportunity for Citizens, and she related to Mr. Kirby the substance of her conversation with Mr. McElheney.

Mr. Kirby was initially not interested in the Cardinal transaction. When Ms. Eichelberger informed him of the Cardinal opportunity, he testified: "My immediate response was that I wasn't interested because I knew Cardinal Federal was a troubled—or I thought Cardinal Federal was a troubled organization in Cleveland, Ohio. My response to Ms. Eichelberger is, why in the world would we put our net worth ... at risk to take on $200 million of deposits?" Tr. at 1784. Mr. Kirby discussed the issue with Citizens' management team and followed up on the conversation with Mr. Muldoon, Su-

pervisory Agent at FHLB–Cincinnati and Mr. McElheney's supervisor. Mr. Kirby testified:

I followed up with a call to Mr. Muldoon, to ask him to explain to me how this would work. He did. I asked him how much cash we could get out of it. Mr. Muldoon said, there is no cash available, but I can give you goodwill that you can book as an asset, and for a period of an extended period of time, you can amortize that asset over the life of whatever the predetermined extended period of time was, and you will get cash for the deposits. Mr. Muldoon explained the components of the Cardinal transaction to me, the premium or discount, whichever side you're on, and gave me all of the components of that.... He told me exactly what the premium would be to buy those deposits from Cardinal Federal.

Tr. at 280–81. The testimony continued:

QUESTION: Once you learned about the treatment of goodwill as an asset, why were you interested in the Cardinal transaction?

ANSWER: Because I knew at that time I had an agreement—I would have an agreement with Mr. Muldoon that would not impact our net worth account and it would indeed give us an entry into the Cincinnati market and not impact our net worth account, and we would receive cash for those deposits, net the premium, that we would have available to invest in assets, namely mortgage loans, when the time was right.

Tr. at 281. Mr. Kirby discussed the goodwill arrangement with his management team and subsequently with a small group of directors. He would meet with this subgroup individually and periodically to explain, outside the board meetings, what Citizens was doing. No written records of these meetings exist, and none of Citizens' board minutes makes note of Mr. Kirby's discussions with either Mr. Muldoon or the small group of directors.

The testimony of Mr. Muldoon, a jovial witness whose memory admittedly was far less sharp than his wit, suffered as did that of Mr. Kirby from a roteness, no doubt due to the passage of more than a score of years since the events took place. According to

Mr. Kirby, Mr. Muldoon told him that "cash was not available from the FSLIC, but [Mr. Muldoon] suggested and agreed with me that we could book that supervisory goodwill as an asset over an extended period of time and not impact negatively [Citizens'] regulatory capital" Tr. at 303. Mr. Kirby made the same request for cash of Mr. Muldoon for each of the four transactions, and in each case Mr. Muldoon refused, offering goodwill treatment instead. Mr. Kirby viewed the accounting treatment as the *sine qua non* of the Cardinal acquisition, because without it the transaction would have put Citizens immediately out of capital compliance. Mr. Muldoon testified to the same effect, relating that for each transaction he promoted goodwill as a substitute for FSLIC. assistance.

Mr. Kirby discussed the Cardinal transaction with Robert F. Seaton, Cardinal's President and CEO, once by telephone. "[B]ut at the time that I discussed the transaction with Mr. Seaton, it wasn't to discuss the components of the sale/purchase, it was just to tell him that we thought we were going to submit a bid, because I already knew what the terms of the deal were going to be ... [f]rom Mr. Muldoon." Tr. at 282. Mr. Kirby also received a letter from Mr. Seaton after Citizens submitted its bid. On March 24, 1982, Donald L. Hersman, Cardinal's Chief Financial Officer, sent a letter to Mr. Kirby, which stated: "This is to advise you that we have accepted your counteroffer to purchase the Southern Region offices of Cardinal Federal Savings. We look forward to beginning negotiations on a final agreement." Mr. Kirby did not recall receiving that letter, nor did he recall any negotiations that led to a final agreement. To the contrary, Mr. McElheney stated that he telephoned Mr. Kirby, advising him that, if he wanted to go forward with the transaction, Citizens would be negotiating with Cardinal.

Defendant unsuccessfully asked the court to strike Mr. McElheney's deposition testimony due to a conflict of interest. It appears that Mr. McElheney during this period received an employment offer from Mr. Kirby to join Citizens in a new finance position. He accepted that offer in April 1982 and ultimately served at Citizens for approxi-

mately two years. Although Mr. McElheney testified that he worked on the Cardinal application only after its conditional approval by FHLB–Cincinnati, he also helped Citizens in the application process itself. The fact remains that one of Mr. McElheney's first responsibilities at Citizens was to work on the Cardinal deal. Although he was not involved with the Homestead or First Federal acquisitions, he worked on the Gateway transaction, as well. The court declines to draw adverse inferences about Mr. McElheney's testimony. This unseemly movement from regulator to employee during April 1982 is more an indicator of the casual relationship and understandings characteristic of Mr. Kirby and FHLB–Cincinnati regulators than of any actual conflict of interest.

By letter dated March 25, 1982, to Mr. Muldoon, Mr. McElheney memorialized meetings that he had with Cardinal's representatives during which he was informed that Citizens was the low bidder on the branches. Another internal FHLB–Cincinnati memorandum, dated April 9, 1982, indicated that FHLB–Cincinnati valued these transactions because they postponed the likelihood of the target thrift's failure. In the case of Cardinal, FHLB–Cincinnati estimated that acquisition by Citizens increased Cardinal's staying power by at least another year. In its Conditional Approval and Digest, dated May 4, 1982, FHLB–Cincinnati categorized the Cardinal transaction as a supervisory merger, because it estimated that Cardinal would have been insolvent within a year without the transaction with Citizens.

Corresponding with the other three merger applications, Citizens' application for merger with Cardinal, dated April 12, 1982, and submitted to FHLB–Cincinnati, includes a pro forma statement of Cardinal's financial condition. This pro forma statement estimated goodwill resulting from the transaction to be $38 million. A letter from Citizens' accountant, Deloitte Haskins and Sells ("Deloitte"), dated April 3, 1982, accompanied the application, stating that the purchase method of accounting would be appropriate for this transaction and would be in accordance with GAAP. The Government's Conditional Approval and Digest recognized the Deloitte opinion. The application for merger also recognized that approval by FHLBB, FSLIC, and any other necessary regulatory agency, as well as the boards of directors of the two institutions, were conditions precedent to the consummation of the transaction between Cardinal and Citizens.

Citizens also requested a net worth forbearance for the acquisition, which allowed Citizens to exclude Cardinal deposits when calculating its regulatory capital ratios. FHLB–Cincinnati granted that forbearance, issuing a forbearance letter on April 30, 1982. The forbearance issued in the Cardinal acquisition, as in the three subsequent transactions at issue, does not mention the possibility that the goodwill regulation could change, nor does it protect Citizens in any way against that eventuality.

Mr. McElheney testified that when Mr. Kirby delivered the application in person, Messrs. Muldoon, Kirby, and McElheney; Ms. Eichelberger; John H. Curp, Citizens' General Counsel; and, possibly, Mr. Thiemann held a meeting to discuss "the overall effect" of the branch acquisition on Citizens "and all of the requirements that [Citizens was] going to have to meet, what [it was] going to receive in return for buying these branches." McElheney Dep. at 138. However, although Mr. McElheney recalled that the consideration Citizens would receive from Cardinal was "a big factor," that "Citizens Federal wanted a lot of cash," and that "this was a big transaction" for both Citizens and Cardinal, he could not recall whether the subject of supervisory goodwill was discussed. *Id.* at 142. He stated nonetheless that "[i]t had to come up sometime because of what [Citizens was] acquiring ...." *Id.* Supervisory goodwill was "a big aspect" of the transaction. *Id.* at 143.

On April 12, 1982, FHLB–Cincinnati conditionally approved the merger. The approving resolution, Bank Board Resolution V–O–M–82–7, required Citizens to submit an independent accountant's letter indicating the justification under GAAP, specifically describing goodwill, and substantiating the reasonableness of the goodwill amounts and the amortization periods. The Resolution also required Citizens to submit an opinion from

local counsel that consummation of the acquisition was in accordance with the Purchase Agreement. Both Citizens' and Cardinal's CEO's were required to submit a letter certifying that, as of the effective date of the acquisition, no adverse change had occurred in the condition and operation of the respective financial institutions "that the acquisition had been consummated consistent with the pro forma statement of condition." The pro forma documents submitted in conjunction with the application informed the Government of the estimated amount of goodwill that could result from the transaction, which in this case totaled $38 million.

FHLB–Cincinnati's Conditional Approval and Digest, dated May 4, 1982, recognized that the feasibility of the transaction was dependent on its being consummated in accordance with the terms of the Agreement and the pro forma statement of condition. It also contained the same requirement as the Resolution—that an independent accountant approve the appropriateness of the accounting treatment used—and required Citizens to submit that opinion to FHLB–Cincinnati. As in the other three transactions, the Conditional Approval and Digest also recognized that goodwill, in the amount of $35 million, would result from the transaction and that the goodwill would be amortized over a 30–year period.

Citizens thereafter submitted the required documents to FHLB–Cincinnati. Citizens' general counsel Mr. Curp, in a May 11, 1982 letter, certified, as required, that the purchase was consummated in accordance with the Purchase Agreement. In letters dated May 11, 1982, the presidents of Citizens and Cardinal, Messrs. Kirby and Seaton, each certified that the purchase had been consummated consistent with the pro forma statements. Plaintiff also submitted the requisite independent accountant's letter, prepared by Deloitte and dated May 27, 1982, which stated that the purchase method of accounting was appropriate for the transaction. The letter noted that goodwill, if any, would be amortized over the course of 40 years.[4]

The Government ultimately approved Citizens' application. In a letter dated June 8, 1982, FHLB–Cincinnati notified FHLBB in Washington, DC, that it had conditionally approved the Cardinal branch acquisition and requested that FHLBB also review the application. FHLBB replied in a letter dated June 18, 1982, that it had received the documentation accompanying the June 8 letter and stated that "[w]e are closing the file on this case," thereby indicating that FHLBB did not object to FHLB–Cincinnati's approval. FHLB–Cincinnati then notified Mr. Kirby by letter dated June 30, 1982, that the purchase of the Cardinal branches satisfied the conditions of Bank Board Resolution V–O–M–82–7 and that "[n]o further approval is necessary." An internal FHLB–Cincinnati memorandum dated August 11, 1982, confirmed that the transaction complied with the conditions for approval and that Cardinal's southern region was now part of Citizens. The memorandum reflected that the effective date of the Cardinal acquisition was April 30, 1982.

In a FHLBB Report of Examination of Citizens, dated October 22, 1983, FHLBB noted that Citizens recorded goodwill of $38.16 million as a result of the Cardinal branch acquisition, which was being amortized over the course of 30 years. The net-worth-to-asset ratios reflected in the report presumed that goodwill was counted as an asset. The FHLB–Cincinnati Conditional Approval and Digest commented that the sale of Cardinal's southern region to Citizens increased Cardinal's staying power to mid–1985.

At the time of the Cardinal acquisition, the regulatory capital requirement was four percent. Before the acquisition, Citizens' regulatory capital was at 5.68 percent of its total capital reserve. After the transaction, with goodwill counting toward Citizens' capital requirement, the ratio was 4.14 percent. Without the special goodwill treatment, however, Citizens' post-transaction ratio would have been 0.06 percent, well below the required minimum.

#### 2. *Gateway*

The second transaction that Citizens undertook at the suggestion of FHLB–Cincin-

---

4. Ultimately, Citizens amortized the goodwill over the course a 30–year period.

nati was the branch acquisition of Gateway Federal Savings and Loan ("Gateway"). In a May 17, 1983 Adverse Rating Report, FHLB–Cincinnati estimated that Gateway's staying power was "reduced to 5 months as of 12/31/82." Mr. Kirby testified that Mr. Muldoon initiated contact with Citizens regarding Gateway. Mr. Muldoon, for his part, testified:

> QUESTION: And do you recall whether you initiated some of the transactions that are the subject matter of this litigation, Cardinal, Gateway, Homestead and First Federal?
>
> ANSWER: I believe I did.

Tr. at 1761. Mr. Muldoon could. not testify as to specifics regarding who initiated discussions about each transaction in this litigation.

Citizens then requested a bid package for the Gateway transaction. Mr. Kirby testified that Citizens asked for cash in its initial interest bid for Gateway. He negotiated with Mr. Muldoon about the terms of the Merger Agreement, asking him again for cash, but Mr. Muldoon again refused. According to Mr. Kirby, Mr. Muldoon once again said that cash was not available, but agreed to special accounting treatment whereby supervisory goodwill was treated as an asset, to be amortized over an extended period of time. As a result, the transaction would not negatively impact Citizens'. regulatory capital. Plaintiff suggests that the negotiation between Messrs. Kirby and Muldoon is evidenced by the fact that its August 30, 1982 bid package requested a cash infusion of $25 million and a cash deposit of $100 million, but Mr. Muldoon refused and offered the goodwill treatment as a substitute.

Plaintiff contends that the terms of its contracts with the Government are contained in its correspondence with FHLB–Cincinnati during the course of the Gateway transaction. On November 9, 1982, Mr. Kirby wrote a letter to Andrew R. Neidert, Gateway's President, stating: "Upon the advice of the Federal Home Loan Bank Board, we have today submitted to them a conditional proposal to purchase the [Gateway branches] mentioned above." A letter dated December 6, 1982, from Mr. Neidert and Philip W. Casper, Gateway's Chairman of the Board, to

Mr. Muldoon accompanied a merger plan with Citizens, which "represents the least cost alternative to the Federal Savings and Loan Insurance Corporation (FSLIC) because the plan calls for no FSLIC cash assistance." An internal memorandum from FHLB–Cincinnati Regional Director Edward J. O'Connell, III, to Mr. Muldoon, dated February 25, 1983, reflected that the acquisition by Citizens would extend Gateway's viability by two years.

Mr. Kirby wrote another letter to Mr. Neidert, dated January 14, 1983, which opens: "As a follow up to our telephone conversation this morning, I am submitting for your consideration the terms of what is to be our final offer for your offices located in Lebanon and Wilmington, Ohio." The letter lists four terms and closes with the sentence: "Andy, as I stated, we sincerely hope that you will act favorably on this our final offer." At trial Mr. Kirby said that he did not recall having made a series of offers to Mr. Neidert. He denied that any negotiations between Mr. Neidert and himself ever took place. Mr. Kirby testified:

> QUESTION: All I'm saying is that the position you've taken is, in a sense, that Muldoon said this is the deal, and yet we see the contemporaneous documentation, maybe it wasn't you who did it, maybe it was Citizens through Mr. McElheney, but it appears that there was no final deal set down, it was putting you into contact with Mr. Neidert and there were a series of offers and this letter of January 14 reflects a final offer. Can you explain a way to sort of disabuse us of that interpretation of these records?
>
> ANSWER: The only thing that I can tell you is I did not negotiate with Mr. Neidert; I negotiated strictly and entirely with Mr. Muldoon at the Federal Home Loan Bank. . . . The agreement that I had with Mr. Neidert, without a specified amount, is that whatever the supervisory goodwill was, I could book as an asset.
>
> QUESTION: You mean Muldoon?
>
> ANSWER: Pardon me, Muldoon. I could book as an asset and amortize that asset, whatever the amount was, over a period of

extended years, and count that as regulatory capital.

Tr. at 757–58.

Citizens signed the Purchase Agreement on January 17, 1983. At that time Mr. Kirby again requested a net worth forbearance allowing Citizens not to count the Gateway branch liabilities in computing Citizens' regulatory capital. Citizens did not request or receive any type of accounting forbearance that would recognize the goodwill treatment regardless of a change in regulations. The Purchase Agreement, included in the merger application submitted by plaintiff on January 20, 1983, stated that a condition precedent to the merger was the approval of FHLBB, FSLIC, and any other necessary regulatory agency with respect to the transaction contemplated by the agreement.

FHLB–Cincinnati issued Bank Board Resolution V–O–P–83–2 on February 25, 1983, conditionally approving the merger. The net worth forbearance was issued on the same date. In conformance with the Resolution, local counsel completed the certification as required in a letter dated March 30, 1983, certifying that the merger complied with the Bank Board Resolution. Per the Resolution Messrs. Kirby and Neidert, in a March 1, 1983 letter, informed Mr. Muldoon that the purchase had been completed consistent with the pro forma statement of condition contained in the merger application. On May 23, 1983, Deloitte wrote the required letter stating that the purchase method of accounting was appropriate for the Gateway transaction, in accordance with GAAP and that goodwill, if any, would be amortized over the course of ten years.

FHLB–Cincinnati forwarded Citizens' materials to FHLBB and, in a letter dated June 16, 1983, requested the latter to verify that the compliance materials were acceptable. FHLBB wrote FHLB–Cincinnati on June 23, 1983, stating that it had received the documentation regarding the merger and it was "closing the file on this case." FHLB–Cincinnati subsequently advised plaintiff by a

July 12, 1983 letter that FHLB–Cincinnati and FHLBB considered the merger to comply with the conditions in the Resolution and that "[n]o further approval is necessary." The merger benefitted the Government by extending Gateway's staying power from 4.8 months to 18.5 months, as reflected in a February 8, 1983 letter from FHLB–Cincinnati to FHLBB.

Plaintiff ultimately booked $9.4 million in supervisory goodwill from the Gateway transaction. Before the Gateway acquisition, Citizens' regulatory capital ratio was 4.17 percent, in excess of the three percent required at that time. After the acquisition the ratio fell to 3.74 percent. Without the special supervisory goodwill treatment, and calculating the capital ratio on a cumulative basis— that is, including the Cardinal transaction that preceded the Gateway acquisition [5]— Citizens' ratio would have been just 0.18 percent, well below the regulatory minimum. Mr. Kirby testified that he would not have entered into the Gateway transaction had it not been for the goodwill treatment available at that time.

### 3. *Homestead*

The next supervisory transaction was a merger with Homestead Federal Savings and Loan Association ("Homestead"). A May 28, 1982 FHLB–Cincinnati Adverse Rating Report indicated that Mr. Muldoon believed that the thrift had seven months of life remaining. The report recorded that Mr. Muldoon suggested that one way to save the thrift was to infuse new capital through a merger. The report stated that "the association should contact the following thrifts" and listed seven thrifts. Citizens was first on the list.

FHLB–Cincinnati wrote the Homestead board of directors on August 4, 1982, noting that the association's staying power was estimated at 9.5 months: "It is [FSLIC's] and our preference that the institution locate a suitable merger partner." In a July 31, 1982 report on Homestead, FHLB–Cincinnati esti-

---

5. In calculating plaintiff's capital ratio, the pro forma statements and the digest prepared by FHLB–Cincinnati take into account the cumulative effect of goodwill. Plaintiff also calculated

goodwill on a cumulative basis when considering whether or not to enter into subsequent supervisory transactions.

mated that the association's staying power was eight months and advised that "the only resolution of the association's problem lies in a merger with a stronger and more stable institution. A voluntary merger without FSLIC assistance should be able to be arranged."

Mr. Kirby testified that Mr. Muldoon also initiated contact with him about Homestead. Mr. Kirby initially decided against the Homestead merger, but he changed his mind by the end of 1984 because of the negative impact a failed Homestead would have on the other thrifts in the region. He testified:

> By the ... middle to the end of 1983, ... it was well known in the ... local financial industry, and I include commercial banks, that Homestead Federal was a very weak thrift and was suffering from a lot of problems. By the time 1984 had come, the thing that concerned me the most was that if Homestead Federal did fail, it would have a negative impact on primarily the other thrifts in the area, of which we were one, of course, and even the financial environment in the whole Dayton community. That was, indeed, a big concern of mine, and I didn't want to see that happen because of the impact it might have on Citizens Federal in particular and the community as a whole.

Tr. at 296–97.

Mr. Kirby requested cash assistance from Mr. Muldoon for the Homestead transaction, but Mr. Muldoon could not provide cash. Instead, Mr. Muldoon offered him the same regulatory treatment previously offered in the Cardinal and Gateway transactions.

Although Citizens originally planned to use the pooling method of accounting for this transaction,[6] Citizens ultimately used the purchase method because it intended to dispose of a substantial portion of Homestead's assets after acquisition. Mr. McElheney wrote Deloitte in a letter dated February 16, 1984, outlining the reasons why the purchase method was more appropriate for the transaction. In a letter of the same date, Mr. McElheney wrote Mr. Muldoon at FHLB–Cincinnati requesting that the transaction be accounted for using the purchase method, which, unlike the pooling method, would generate goodwill.

The Government approved the use of purchase accounting by ultimately approving the Homestead merger application. The Homestead Merger Agreement, signed by the parties on January 17 and 18, 1984, provided that the merger was contingent on approval by FHLBB and FSLIC. Citizens submitted a pro forma statement dated February 16, 1984, to FHLB–Cincinnati, which estimated that the transaction would result in $22 million in goodwill and that Citizens would have deferred losses of $15.4 million. Deloitte forwarded its letter dated February 20, 1984, to the Government stating that the purchase method of accounting was appropriate and in accordance with GAAP. An internal government memorandum dated February 23, 1984, memorializes the correspondence received from Citizens and Deloitte regarding the purchase method of accounting. The memorandum also notes that the transaction under the purchase method will result in "goodwill of approximately $22,100,000" and that the consolidation under the purchase method would give Citizens a net-worth-to-assets ratio of 3.8 percent.[7] The memorandum concludes: "Therefore, this amendment to the application and attached digest, for applying purchase accounting to the merger, is hereby approved."

Plaintiff again requested a net worth forbearance, which FHLB–Cincinnati granted on January 25, 1984. FHLB–Cincinnati issued Resolution V–O–M–84–2 regarding the Homestead merger on February 23, 1984, which included the same requirements as the Cardinal and Gateway Resolutions. The

---

**6.** Under the pooling method of accounting, upon merger the assets and liabilities of each entity simply are added together. The historic value of the assets is used for calculating net worth. No goodwill is created under this accounting method. Under the purchase method, the assets are "marked to market" after the consummation of the transaction, so they appear on accounting books at their fair market value. The latter method can generate goodwill.

**7.** This ratio was calculated on a cumulative basis, taking into account the previous Cardinal and Gateway transactions.

Resolution entailed certification by local counsel that, as of the effective date of the merger, the transaction was consummated in accordance with the Merger Agreement. The CEO's of Homestead and Citizens were required to certify that no adverse change had occurred in the conditions of their respective thrifts and that the merger had been consummated in accordance with the pro forma statement. The Resolution again obliged Citizens to submit an independent accountant's letter, indicating why the accounting method used was appropriate under GAAP and describing and substantiating the amount of goodwill produced and its amortization period. FHLB–Cincinnati's original merger digest, dated February 21, 1984, noted that Citizens' net-worth-to-assets ratio would be 3.7 percent after the merger, which reflected the supervisory goodwill treatment.

Citizens provided the necessary documentation, and FHLB–Cincinnati submitted the materials to FHLBB for final approval on February 28, 1984. FHLBB wrote FHLB–Cincinnati by letter dated April 18, 1984, indicating that it had received the documentation and that "[w]e are closing the file on this case." As with the previous transactions, FHLB–Cincinnati notified Citizens of the approval, this time in a letter dated April 30, 1984, that concluded: "No further approval is necessary."

William M. Vichich, Citizens' Chief Financial Officer at the time, testified that Citizens recorded $36.371 million in goodwill from the Homestead transaction.[8] Before the Homestead acquisition, Citizens had a regulatory ratio of 3.73 percent; after the transaction that ratio dropped to 3.18 percent, which was still above the three percent regulatory minimum. Without the goodwill treatment, however, Citizens' regulatory ratio would have been negative 2.15 percent, which would not only have rendered Citizens out of capital compliance, but also insolvent. Indeed, Mr. Kirby testified that the transaction would not have made sense had Citizens not been able to count goodwill towards its capital requirement.

8. The difference between this figure and the $22 million in goodwill previously estimated is accounted for by the approximately $15 million in deferred losses that were recorded on the Febru-

### 4. First Federal

The final transaction at issue is Citizens' acquisition of First Federal Savings and Loan Association ("First Federal"). An internal FHLB–Cincinnati memorandum to FHLBB, dated July 16, 1985, noted that First Federal failed to meet its net worth requirements for year-end 1983 and 1984 and was advised to seek a merger partner. Mr. Kirby testified that Mr. Muldoon contacted him about First Federal. Mr. Kirby was not interested initially because of First Federal's size. However, Mr. Kirby testified: "I spoke with my management team, and I was reminded by the management team that we did not have any market penetration into the western portion of Cincinnati and it might be a good fit for us." Tr. at 296. Thus, Mr. Kirby was persuaded to look into the First Federal transaction. He testified that once again he asked Mr. Muldoon for cash, but Mr. Muldoon instead offered supervisory goodwill treatment for the transaction: "Mr. Muldoon and I agreed that the same process would be acceptable to the Federal Home Loan Bank, whereas we could take the supervisory goodwill, book it as an asset for an extended period of time and use it as regulatory capital." Tr. at 300–01.

As in the three previous transactions, the March 25, 1985 First Federal Merger Agreement made the transaction conditional on FHLBB and FSLIC approval. Citizens' pro forma statement, submitted with the merger proposal, estimated that $5.1 million in goodwill would result from the transaction, to be amortized over a 20–year period. Citizens wrote Deloitte a letter dated May 1, 1985, noting that Citizens was planning to dispose of a substantial portion of First Federal's assets after the merger, therefore concluding that the purchase method of accounting was appropriate. Deloitte responded in a letter dated May 10, 1985, that the purchase method was appropriate for the transaction under GAAP guidelines.

ary 16, 1984 pro forma, which was submitted to FHLB–Cincinnati. The deferred losses were calculated as part of the final supervisory goodwill figure.

As with the previous three transactions, Citizens again requested a net worth forbearance letter of FHLB–Cincinnati, which was granted. FHLB–Cincinnati approved the transaction by Resolution V–O–M–85–7, dated July 19, 1985, which made approval conditional on the same requirements as in the prior transactions. Citizens submitted the required documentation, which FHLB–Cincinnati reviewed and submitted to FHLBB with a September 9, 1985 cover letter noting that the regional agency considered the documentation to be satisfactory to meet the Resolution's requirements. In a letter dated September 24, 1985, FHLBB agreed with FHLB–Cincinnati's assessment and approved the merger, with the same notation as in the earlier transactions: "We are closing our files on this case."

Before the First Federal transaction, Citizens' regulatory capital ratio was 3.24 percent. After the transaction it rose to 3.4 percent. Without the goodwill treatment, however, the ratio again would have been negative—this time at 1.27 percent—which manifests not only capital noncompliance, but also insolvency.

### 5. *Impact of FIRREA*

FIRREA instituted new capital requirements, effective December 7, 1989. *See Winstar III*, 518 U.S. at 856–57, 116 S.Ct. 2432. The statute established new categories of regulatory capital: tangible capital, core capital and risk-based capital. The capital requirements were more strict than those previously in effect. In plaintiff's annual chairman's report for 1989, Mr. Kirby noted that, before the enactment of FIRREA, Citizens had a capital cushion of $40 million, which signifies that the thrift held $40 million in capital above the minimum regulatory requirement. The report continued: "The enactment of FIRREA placed the association out of capital compliance as a result of not being able to count supervisory goodwill, which was incurred for the benefit of the Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation, on supervisory acquisitions made during the 80's."

FIRREA's new tangible capital requirement excluded goodwill as an asset. As the first consequence, Citizens showed an immediate tangible capital deficiency of $5.7 million. Second, FIRREA phased goodwill out of the new core capital requirement. Despite the fact that the phase-out process was gradual, Citizens nevertheless immediately was out of compliance of its core capital requirements by $6.6 million. Finally, FIRREA phased goodwill out of risk-based capital, which resulted in the immediate deficiency of $53.7 million. Thus, with the enactment of FIRREA, Citizens was out of compliance with respect to all three categories of capital requirements.

A November 13, 1989 OTS report anticipated that Citizens would be unable to meet the new capital requirements under FIRREA. The report stated: "Based on the data submitted in your Thrift Financial Report for June 30, 1989, we believe that you will fail one or more of the capital requirements imposed on December 7." In fact, an OTS report dated February 28, 1991, stated that "[t]he association previously was able to exceed minimum regulatory requirements due to the high amount of goodwill on its books. Following the passage of FIRREA, the association failed each of the three new minimum capital standards."

### DISCUSSION

#### I. *Standards*

In granting defendant's motion for judgment on partial findings with respect to liability pursuant to RCFC 52(c), at the close of plaintiff's case-in-chief, the court ruled that plaintiff had failed to prove the existence of contracts between Citizens and the Government.

■ RCFC 52(c) provides, as follows:

If during a trial a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

"In the Court of Federal Claims, the judge serves as both the trier of fact and the trier

of law." *Cooper v. United States*, 37 Fed.Cl. 28, 35 (1996). A motion for judgment on partial findings requires more than determining if plaintiff has made a *prima facie* case. Rather, Rule 52(c) allows the judge to weigh the evidence presented, but unlike a motion for summary judgment, does not require that the judge resolve all credibility determinations in favor of plaintiff. *See Cooper*, 37 Fed.Cl. at 35 (citing *Howard Indus., Inc. v. United States*, 126 Ct.Cl. 283, 115 F.Supp. 481, 484–85 (1953); *Cities Serv. Pipe Line Co. v. United States*, 4 Cl.Ct. 207, 208 (1983), *aff'd*, 742 F.2d 626 (Fed.Cir.1984)). The Court of Claims in *Howard Industries* set forth the following guidelines:

> When a court sitting without a jury has heard all of the plaintiff's evidence, it is appropriate that the court shall then determine whether or not the plaintiff has convincingly shown a right to relief. It is not reasonable to require a judge, on a motion to dismiss under Rule 41(b) [the precursor to RCFC 52(c)], to determine merely whether there is a *prima facie* case ... sufficient for the consideration of a trier of the facts *when he is himself the trier of the facts*.... A plaintiff who has had full opportunity to put on his own case and has failed to convince the judge, as trier of the facts, of a right to relief, has no legal right under the due process clause of the Constitution, to hear the defendant's case, or to compel the court to hear it, merely because the plaintiff's case is a *prima facie* one in the jury trial sense of the term.

115 F.Supp. at 485–86 (citations omitted). The time for plaintiff to prove its case is during its case-in-chief. *Cooper*, 37 Fed.Cl. at 35. "A plaintiff has no automatic right to cross-examine a defendant's witnesses for the purpose of proving what the plaintiff failed to establish during the presentation of its case." *Id.* The court rules in favor of defendant on the issue of liability, and this opinion addresses that issue alone.[9]

## II. *Background*

The Supreme Court in *Winstar III* ruled that the enactment of FIRREA breached the contracts that existed between the Government and plaintiffs. These plaintiffs proved the existence of their contracts by providing evidence of the traditional manifestations of an express written contract: written agreements expressing a mutual intent to be bound by specific undertakings—specifically, the use of purchase method accounting and the amortization of a specified amount of supervisory goodwill over an agreed-upon number of years to satisfy regulatory capital requirements. The three transactions reviewed in *Winstar III* presented the strongest cases for contract formation compared with the subsequent cases that have come before the Federal Circuit and the Court of Federal Claims.

*Winstar III* explained how goodwill functioned within the context of a supervisory transaction. One way a merger or acquisition can be accounted for under GAAP is through the purchase method of accounting. 518 U.S. at 848, 116 S.Ct. 2432. Under the purchase method, a transaction can generate an intangible asset called goodwill. In the context of the supervisory merger, goodwill arose when the purchase price of a target thrift exceeded the value of its05 assets. *Winstar III*, 518 U.S. 858–49, 116 S.Ct. 2432.

> In the ordinary case, the recognition07 of goodwill as an asset makes sense: the rational purchaser in a free market, after all, would not pay a price for a business in excess of the value of that business's assets unless there actually were some intangible 'going concern' value that make up the difference.

*Id.* at 849, 116 S.Ct. 2432 (citation and footnote omitted).

The Supreme Court observed that goodwill was essential to the supervisory merger scheme, because it make a thrift attractive to the acquiring thrift. *Winstar III*, 518 U.S. at 849–50, 116 S.Ct. 2432. The goodwill treatment could be critical to the transaction, "because in most cases the institution resulting from the transaction would immediately have been insolvent under federal standards if goodwill had not counted toward regulato-

---

9. By seeking judgment in its favor under RCFC 52(c), defendant forfeited the opportunity to introduce evidence on the authority of FHLB–Cincinnati to bind FHLBB to an enforceable contract. This court ruled that plaintiff had established on summary judgment that implied actual authority was present. *See Fifth Third II*, 52 Fed.Cl. at 643. Nonetheless, plaintiff established at trial that FHLB–Cincinnati had the requisite authority. *See infra* III(4).

ry net worth." *Id.* at 850, 116 S.Ct. 2432. Goodwill also expanded the acquiring thrift's asset base, allowing the thrift to leverage it in order to extend more loans and thereby make more profits. *Id.* at 851, 116 S.Ct. 2432.

Another advantage of supervisory goodwill was the associated extension of the amortization period. Thrift regulators allowed an acquiring institution to amortize goodwill for long periods up to the 40-year maximum allowed under GAAP.*Winstar III*, 518 U.S. at 851, 116 S.Ct. 2432. Amortization accounts for the fact that assets decline in value over time. *Id.* The longer the amortization period, the slower the recognized decline in the value of the asset.A corresponding accounting convention, accretion, recognizes the increase in value of an asset over time. *Id.* at 852, 116 S.Ct. 2432. Loans extended by a thrift, for examle, increase in value as they approach the date at which they are repaid. *Id.* While regulators generally set the accretion period over the life of the loan (typically seven years), the amortization periods for goodwill extended for up to 40 years. *Id.* "The difference between amortization and accretion schedules thus allowed acquiring thrifts to seem more profitable than they in fact were." *Id.* at 853, 116 S.Ct. 2432.

The Supreme Court recognized that, while GAAP allowed for goodwill, its use in the supervisory context was novel in some ways. The Court explained:

*Winstar III*, 518 U.S. at 853–54, 116 S.Ct. 2432 (citation omitted). The Court noted that the more accounting treatment deviated from GAAP, the more prudent it was for a thrift to seek an agreement on the transaction. "The advantageous treatment of amortization schedules and capital credits in supervisory mergers amounted to exclude 'unidentifiable intangible assets,' more clearcut departures from GAAP and, hence, subjects worthy of agreement by those banking on such treatment." *Id.* at 855.

The regulatory response to the thrift crisis in the early 1980's ultimately was unsuccessful. *Winstar III*, 518 U.S. at 856, 116 S.Ct. 2432. Congress passed FIRREA, which eliminated the use of goodwill towards a thrift's regulatory requirement. FIRREA required thrifts to " 'maintain core capital in an amount not less than 3 percent of the savings association's total assets,' § 1464(t)(2)(A), and defined 'core capital' to exclude 'unidentifiable intangible assets,' § 1464(t)(9)(A), such as goodwill." *Id.* at 857, 116 S.Ct. 2432. The Act contained a transition rule which was phased out by 1995. *Id.*

### III. Contract formation

#### 1. Contract principles

■ The Supreme Court in *Winstar III* directed courts deciding *Winstar*-related cases to apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." *Winstar III*, 518 U.S. at 871, 116 S.Ct. 2432. " 'Any agreement can cert. denied, *534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002)* ("CalFed") *(quoting* Massie v. United States, *166 F.3d 1184, 1188 (Fed.Cir.1999))*.

Plaintiff contends that express contracts existed between the Government and plaintiff. In the alternative, plaintiff contends that the parties entered into implied-in-fact contracts. With regard to the latter, the Federal Circuit has held:

An implied-in-fact contract is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules, Inc. v. United States,* 516 U.S. 417, 424[, 116 S.Ct. 981, 134 L.Ed.2d 47] (1996) (quoting *Balt. & Ohio R.R. v. United States,* 261 U.S. 592, 597[, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816] (1923)). While an implied-in-fact con-

tract may be inferred from the parties' conduct, the required elements for contract formation—"a mutual intent to contract including an offer, an acceptance, and consideration"—are the same for express and implied-in-fact contracts. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997).

*Maher v. United States,* 314 F.3d 600, 606 (Fed.Cir.2002).

Whether a contract exists is a question of law and fact. *CalFed,* 245 F.3d at 1346 (citing *Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir.1998)). Mutuality of intent is critical to the issue of whether a contract exists, because, "[a]bsent some evidence of contractual intent, no promise can be found, whether it be a promise to continue to regulate in a certain manner for a certain period of time, a promise to insure against a change in the law, or otherwise." *Fifth Third I,* 52 Fed.Cl. at 270 (citing *Winstar III,* 518 U.S. at 918, 116 S.Ct. 2432).

### 2. *Offer and acceptance*

Plaintiff contends that FHLB–Cincinnati requested that Citizens participate in the four supervisory transactions in this case and initiated negotiations with plaintiff's management to arrange the mergers and acquisitions. Plaintiff casts Mr. Kirby's interactions with Mr. Muldoon as negotiations and puts forth that their understanding of the accounting treatment formed binding contracts with the Government. "In the course of these [four] transactions plaintiff and the government negotiated and agreed that plaintiff could book the net liabilities acquired as 'supervisory goodwill'—an intangible asset to be amortized over periods of time between 10 and 30 years—and that plaintiff could count the supervisory goodwill as an asset for purposes of computing Citizens' regulatory capital requirements." Pl.'s Br. filed Jan. 6, 2003, at 4.

According to plaintiff, the Government induced plaintiff to enter into the four transactions at issue in this case. Mr. Kirby testified on direct examination, as follows:

QUESTION: And what was it about the Cardinal transaction and selling the 13 branches to Citizens Federal that made it attractive to Citizens Federal?

ANSWER: In the beginning, I didn't think that the acquisition of Cardinal Federal made any sense whatsoever to Citizens Federal, because I didn't—I did not, at that point, understand what the use of supervisory goodwill was, and I thought it would be a direct hit to our capital or net worth line. So at first blush, I really wasn't interested in it. But after I discussed it with Mr. Muldoon and he told me what the components were of the deal, what it would take to make the deal, and explained to me how supervisory goodwill functioned in order to—and the way supervisory goodwill functioned was that you took the goodwill, the supervisory goodwill, and added it as an asset. You were given an extended period of time to amortize that goodwill and use that goodwill as regulatory capital. It really took a while for our management team to work through that process to really understand it, but once we understood it, in lieu of cash—and I asked Mr. Muldoon because, of course, Cardinal Federal was insured by the FSLIC, and anybody in the financial institution business understands that, when the FSLIC had to take over a liquidated thrift, they usually paid the depositors off in cash or transferred the assets to another company. Once I understood the effects of supervisory goodwill in that it wouldn't affect our net worth or capital account, our team and select members of our board became interested.

Tr. at 299–300. Mr. Kirby had never heard of the concept of supervisory goodwill before the transactions, "[a]nd it was indeed, as it was explained to me by Mr. Muldoon, it was a new concept that was being used as an option of the Federal Home Loan Bank to settle issues with troubled thrifts, without using the cash from the FSLIC." Tr. at 301.

Mr. Muldoon acknowledged that "at each of the four [transactions], I did promote the use of goodwill as a ... substitute for FSLIC assistance." Tr. at 1762. He explained:

QUESTION: Was there a national policy to deal with these problem thrifts at that time?

ANSWER: ... [B]eginning, I think, in '81/'82, FSLIC started running out of money, and we were advised that they didn't want to see—really see any FSLIC-assisted cases where [FSLIC] had to put any cash into those cases.

....

QUESTION: How did you learn of this national problem with respect to—or national policy with respect to FSLIC?

ANSWER: [W]e had contact with FSLIC on a direct basis. We had contact with the department of supervision in Washington. We had meetings where we were—where the problems were discussed, whether these were supervisory agents' meetings or bank presidents' meetings, or other meetings of that sort. But it became quite clear that the Bank Board and the FSLIC wanted us to consider whatever other avenue we might have to solve mergers and to save FSLIC's resources.

Tr. at 1750–51.

FHLB–Cincinnati initiated contact with Citizens with respect to all four transactions.[10] In each case Mr. Kirby asked Mr. Muldoon for cash, and in each instance Mr. Muldoon said that he could not offer cash, but could offer special regulatory accounting treatment for the goodwill generated from the transactions.

Mr. Kirby regarded the accounting treatment as essential to each transaction, because, without the supervisory goodwill, Citizens would have fallen out of capital compliance immediately:

QUESTION: Would you have done any of these transactions without the promise that goodwill would count as an asset for regulatory purposes and grant you an extended period for the amortization of that goodwill?

ANSWER [Mr. Kirby]: I would not have ... because that would have been what I and my management team used to refer to as net worth or capital suicide, because we understood full well not only the initial effect from Cardinal but the cumulative

effect of each and every one of those acquisitions ....

Tr. at 304.

Mr. Muldoon agreed with Mr. Kirby's assessment of their interactions: When asked if the purchase method of accounting for supervisory goodwill was an essential element of the supervisory transactions, he answered in the affirmative. FHLB–Cincinnati conducted a viability analysis before approving each of the four transactions in this case and approved the pro forma statements of condition, showing the institutions' financial positions before and after the mergers and acquisitions. Mr. Muldoon confirmed that the Government would not have approved the transactions if the resulting thrift would not have been in capital compliance.

It was FHLBB's national policy to encourage this type of acquisition.

Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of 'supervisory mergers.' See GAO, Solutions to the Thrift Industry Problem 52; L. White, The S & L Debacle: Public Policy Lessons for Bank and Thrift Regulation 157 (1991) (White).... [T]he principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations.

*Winstar III*, 518 U.S. at 847–48, 116 S.Ct. 2432 (footnote omitted). In each of the four transactions, Mr. Muldoon "promote[d] the use of ... supervisory goodwill as a substitute for FSLIC assistance." Tr. at 1762. He explained:

QUESTION: Did you utilize supervisory goodwill as an inducement to get Citizens to do these deals with the unhealthy thrifts?

Muldoon remembered having initiated contact with Citizens in "some of the transactions" in this case, but did not testify to specifics. Tr. at 1761.

10. In the case of Cardinal, Mr. McElheney contacted Ms. Eichelberger; in the Gateway, Homestead, and First Federal transactions, Mr. Kirby testified that Mr. Muldoon contacted him. Mr.

ANSWER [Mr. Muldoon]: Yes, sir ... I was, in effect, I became a seller of troubled thrifts, and I was using every vehicle, every tool at my disposal to do that, to save the FSLIC, to get rid of the problems as soon as I could, with the least cost I could. And I did use that tool as an inducement, instead of cash....

Tr. at 1764. Mr. Muldoon's characterization of his intent is confirmed, albeit only generally, by the deposition testimony of Messrs. McElheney and Thiemann. Mr. McElheney testified cryptically that supervisory goodwill "wasn't important, but it was a matter of fact it happened only because of the way we were accounting for the transactions." McElheney Dep. at 39. Although the court sustained defendant's objection to Mr. McElheney's testifying that the parties had formed a contract, his testimony was admitted to show his perception of the parties' intent: "[T]here was some type of agreement between the bank and Citizens." *Id.* at 147. He viewed FHLB–Cincinnati, and by extension FHLBB, as having "granted certain provisions that they could do in taking on these branches" and both parties as being bound by FHLBB's approval. *Id.* However, he conceded on cross-examination that regulations change, including changes that occurred pre-FIRREA with respect to net worth requirements. *Id.* at 219.

Mr. Thiemann, Principal Supervisory Agent at FHLB–Cincinnati, had no specific recollection of the four transactions. He opined that "there generally had to be some incentive for the strong institutions to acquire the weak.... The strong institution didn't want to jeopardize itself without some payoff." Thiemann Dep. at 21. Goodwill provided such an incentive. Once approved by FHLBB, Mr. Thiemann believed that supervisory goodwill could not be taken away. "My assumption was it was permanent." *Id.* at 45.

### 3. *Consideration*

Plaintiff contends that both parties benefitted from the transactions. The primary consideration given by Citizens was its commitment to merge with or acquire the institutions or branches at issue. Citizens' willingness to take over the failing institutions and branches gave the Government the benefit of time. The Federal Circuit has acknowledged that supervisory mergers benefitted the Government by saving FSLIC funds and deferring supervisory actions in the short term: "[T]he action taken by the purchasing [institution] in acquiring the failing thrift did not result in the Government ... saving the dollar value of the net obligations of the thrift.... In a very real sense, what the Government received in exchange for its promise was time." *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1382 (Fed.Cir.2001). Citizens benefitted because it could pursue its business strategy of expanding into different markets, while receiving the benefit of the special supervisory goodwill treatment. It was able to use purchase method accounting, to count the net liabilities acquired as goodwill, to allow that goodwill to be counted as an asset for purposes of computing regulatory capital requirements, and to amortize the goodwill over an extended period of time.

### 4. *Actual authority*

The court has found that the Government's agents possessed implied actual authority to bind the Government in contract. *See Fifth Third II,* 52 Fed.Cl. at 643 ("[A]s of the 1982 delegation, FHLB–Cincinnati had implied actual authority to bind FHLBB to promises regarding the amortization and use of supervisory goodwill contained in plaintiff's applications.").[11] The Supreme Court in *Winstar III* held that the "Bank Board and FSLIC had ample statutory authority to do what the Court of Federal Claims and the Federal Circuit found they did do, that is, promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if

---

11. This ruling was based on Mr. Muldoon's actions, but it was Mr. Thiemann who approved Mr. Muldoon's recommendations. Mr. Thiemann's recollections about the four transactions in this case were prefaced by "I assume." Thiem-

ann Dep. at 107. His testimony about his supervision suffered from the lapse of time, and the court gives it minimal weight. This is in contrast to his testimony regarding the issue of authority, a subject to which he testified with specificity.

that performance became impossible," 518 U.S. at 890, 116 S.Ct. 2432. The Court based its ruling on the "organic statute creating FSLIC as an arm of the Bank Board, 12 U.S.C. § 1725(c) (1988 ed.) (repealed 1989), [which] generally empowered it '[t]o make contracts,' and § 1729(f)(2), enacted in 1978, [which] delegated more specific powers in the context of supervisory mergers.... Nor is there any reason to suppose that the breadth of this authority was not meant to extend to contracts governing treatment of regulatory capital." *Id.* (footnote omitted). The Supreme Court concluded that "[t]here is no serious question that FSLIC (and the Bank Board acting through it) was authorized to make the contracts in issue." *Id.* at 891, 116 S.Ct. 2432.

Apparently, defendant's attack on the authority of FHLB–Cincinnati stems not from the delegation to it to implement FHLBB's national policy, but, rather, from the verity that any contract must have been made at the regional level, if at all, because FHLBB approved generic agency documents. Defendant's point is well taken, as will be discussed; however, the fact remains that FHLB–Cincinnati had implied actual authority to bind the Government to a contract, if one was formed. Mr. Thiemann testified as emphatically as one can in deposition that FHLB–Cincinnati was the agent of FSLIC. *See* Thiemann Dep. at 45–46.

### 5. *Mutuality of intent*

■ Citizens contends that the contractual terms regarding the use of supervisory goodwill are evidenced in FHLBB and FHLB–Cincinnati letters and Resolutions approving the transactions, various applications to merge or acquire the failing thrifts, forbearance letters, Purchase Agreements, Merger Agreements, correspondence, internal government memoranda, testimony of the principal negotiators for the parties, and other documents. Plaintiff quotes this court's previous opinion in *Fifth Third I*, which reiterated the following legal ruling: "The Federal Circuit and the Supreme Court carefully reviewed 'the Bank Board resolutions, Forbearance Letters, and other documents setting forth the accounting treatment to be accorded,' and determined that they were not 'mere statements of then-current regulatory policy, but in each instance were terms in an allocation of risk of regulatory change that was essential to the contract between the parties.'" *Fifth Third I*, 52 Fed.Cl. at 271 (quoting *Winstar III*, 518 U.S. at 894, 116 S.Ct. 2432). Plaintiff relies on this restatement of the law to substantiate the existence of a contractual relationship between plaintiff and the Government through plaintiff's comprehensive documentary evidence.

The Supreme Court concluded that contracts existed in *Winstar III*, based on the documentation of the transactions, including express agreements in the form of assistance agreements and supervisory action agreements with integration clauses. *Winstar III*, 518 U.S. at 861–68, 116 S.Ct. 2432. In the Winstar transaction, the assistance agreement incorporated, by its integration clause, the Bank Board Resolution approving the merger between Winstar and the target thrift and a forbearance letter issued on the date of the agreement. The forbearance letter provided that, " '[f]or the purposes of reporting to [FHLBB], the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by [Winstar] over a period not to exceed 35 years by the straight-line method.'" *Id.* at 864–65, 116 S.Ct. 2432 (quoting assistance agreement). The assistance agreement contained an "Accounting Principles" section, establishing that computations for the purposes of the agreement would be governed by GAAP, "except that where such principles conflict with the terms of this Agreement," and that the Bank Board Resolutions and actions in connection with the merger must prevail over contrary regulations. *Id.* at 865, 116 S.Ct. 2432. The rationale was that the documents reflected an express written contract.

Turning to the next transaction at issue, the Supreme Court rewarded another thrift, Glendale, because it had sought an express contractual commitment from the regulators before embarking on an acquisition that would have been "irrational" or financial "madness," 518 U.S. at 910, 116 S.Ct. 2432, without explicit guarantees that the account-

ing treatment would be recognized as promised. After revisiting the facts underlying that transaction, the Court stated:

> Although one can imagine cases in which the potential gain might induce a party to assume a substantial risk that the gain might be wiped out by a change in the law, it would have been irrational in this case for Glendale to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment.
>
> . . . .
>
> Given that the parties went to considerable lengths in procuring necessary documents and drafting broad integration clauses to incorporate their terms into the contract itself, the Government's suggestion that the parties meant to say only that the regulatory treatment laid out in these documents would apply as an initial matter, subject to later change at the Government's election, is unconvincing. It would, indeed, have been madness for respondents to have engaged in these transactions with no more protection than the Government's reading would have given them, for the very existence of their institutions would then have been in jeopardy from the moment their agreements were signed.

518 U.S. at 863, 909–10, 116 S.Ct. 2432 (citation omitted).

The Court then noted that all three plaintiffs presented written indicia of their contractual intent. As to Glendale, the Supreme Court was impressed by an integration clause that characterized all Bank Board Resolutions and letters as part of the "agreements and understandings" between the parties. *Winstar III*, 518 U.S. at 862, 116 S.Ct. 2432. Both Winstar and Statesman, the third organization in the case, had written agreements with FSLIC containing similar clauses. *Id.* at 864, 866, 116 S.Ct. 2432. Winstar's assistance agreement referred to an "Agreement" and provided that the Resolution adopting such agreement "shall govern" in a conflict with subsequent regulations. *Id.* at 865, 116 S.Ct. 2432. As to Statesman, in addition to the integration clause and specific provision for a capital

credit, the parties executed a separate "Regulatory Capital Maintenance Agreement" reciting the mutual promises. *Id.* at 867, 116 S.Ct. 2432. Each of these transactions was assisted, *i.e.*, money was provided by FSLIC, so that a written assistance agreement with an integration clause would have been contemplated. The Supreme Court nonetheless was adamant about the importance of a written understanding accompanying the agreements. *See id.* at 863, 116 S.Ct. 2432.

In litigation subsequent to *Winstar III*, the Federal Circuit has held the Government to a contract with an acquiring thrift based on less explicit documentation than that relied upon by the Supreme Court in *Winstar III*. The Federal Circuit for the first time in *CalFed* ruled that an implied-in-fact contract existed based on a series of regulatory documents, rather than one discrete document that could be called an express contract. "Based on all of the contemporaneous documents in each of the three transactions, FHLBB and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the forbearance letters." *CalFed*, 245 F.3d at 1347.

The *CalFed* decision was grounded in the parties' prudential actions in having obtained written confirmation of their understandings, in addition to their having engaged in extensive negotiations. Plaintiff thrifts in *CalFed* lacked an assistance agreement or supervisory action agreement, but presented as evidence of a contract documents such as forbearance letters, memoranda, and Bank Board Resolutions that confirmed the intent of the parties to enter into a contractual relationship. 245 F.3d at 1346–47. Although integration clauses akin to the ones that existed in *Winstar III* were not present, the forbearance letter stated that goodwill could be accounted for as agreed regardless of a change in accounting rules. *Id.* at 1345–47. The court also noted the parties' " 'extensive negotiations' " as representing persuasive evidence for finding the existence of a contract. *Id.* at 1347 (quoting *Winstar II*, 64 F.3d at 1542).

The Federal Circuit extended its *Winstar* analysis in *LaSalle Talman Bank, FSB v.*

*United States,* 317 F.3d 1363 (Fed.Cir.2003). At first blush, *LaSalle Talman* appears to recognize a contract based on the agency documents common to the application and approval process in all the *Winstar* cases. *See* 317 F.3d at 1369–70. The court recapitulated: "The government, challenging the judgment of liability, asserts that there was no breach of contract because some of the undertakings and promises in connection with the 1982 mergers and the 1986 rearrangements were recorded not in executed contracts but in agency documents." *Id.* at 1369. The court further stated:

> Although the government argues that the absence of express incorporation of the Bank Board Resolutions into the FSLIC–Talman contracts insulates the government from liability, the Court in *Winstar* established that the arrangements were contractual. The marginal financial condition of Talman in 1982 does not alter the fact that it assumed much larger liabilities upon the undertakings and commitments of the government under the Phoenix program. As the Court observed in *Winstar,* there would be little reason for any thrift to assume added liabilities if that assumption would place it in immediate danger of receivership and dissolution.

317 F.3d at 1370. However, the legal improbability of exalting standard regulatory documents to the level of contract counsels that *LaSalle Talman* can be restricted to its facts.

Based on this line of reasoning, plaintiff argues therefore that *LaSalle Talman* has foreclosed the need for examination of the documents generated by and exchanged between the parties, once plaintiff has established the existence of routine regulatory documents and approval. However, the documents presented in *LaSalle Talman* differ markedly from those introduced on behalf of Citizens in this case, and a close reading of the decision elucidates the boundaries of the Federal Circuit's holding.

Plaintiff in *LaSalle Talman* sued the Government for breach of contract with regard to the acquisition of or merger with four thrifts: Unity Savings Association ("Unity"), North West Federal Savings and Loan Association ("North West"), Alliance Savings and Loan Association ("Alliance"), and First Federal Savings and Loan Association of Peoria ("First Federal SLA"). For each transaction plaintiff had signed a Merger Agreement with the target institution that subjected the transaction to FHLBB approval and provided for use of the purchase method of accounting. The regional Federal Home Loan Bank authority issued a Resolution conditionally approving plaintiff's mergers with Alliance and North West and its acquisition of Unity, which approved the purchase method of accounting and amortization period pursuant to FHLBB Memorandum R–31(b).[12] The Resolution also authorized FSLIC to enter into a Master Agreement and Purchase Agreement with plaintiff.[13]

The Bank Board Resolution regarding the transactions at issue opened with the statement: "Whereas, Said proposed acquisition of assets of Unity, proposed mergers with Alliance and North West and proposed issuance of Income Capital Certificates would be undertaken in connection with and as part of a plan of assistance to be provided by the FSLIC in order to prevent the failures of Unity, North West and Alliance ...." Compl. filed Sept. 21, 1992, Ex. 1 at 2, in *LaSalle Talman Bank, FSB v. United States,* No. 92–652C (Fed.Cl.). Thus, the Resolution recognized the benefit of the transactions to the Government and acknowledged that benefit as an incentive for entering into the transactions. The Resolution further explicitly stated that the amount of FSLIC assistance should not exceed the cost that reasonably would be necessary to save each of the failing thrifts by cash infusion. *Id.* at 3–4. The Resolution also bound the Government via letters certifying the forego-

---

12. Memorandum R–31(b) provided for the amortization of supervisory goodwill over a period of up to 40 years.

13. The Government issued another Resolution regarding plaintiff, conditionally approving its merger with First Federal, and authorizing it to use the purchase method of accounting and amortize goodwill up to 40 years. The Resolutions do not differ in any material way. For the sake of simplicity, the court focuses on the first Resolution for the purposes of its discussion.

ing matters; the relevant clause provides: "[T]he Secretary or an Assistant Secretary is hereby authorized and directed to send to [plaintiff] letters certifying on behalf of the Bank Board the matters set forth in the preceding resolving paragraph; and the Secretary or an Assistant Secretary is hereby authorized to provide copies of such certifications to any agency of the United States upon request[.]" *Id.* at 6.

Plaintiff in *LaSalle Talman* subsequently entered into a Financing Agreement with FSLIC, dated October 17, 1986, providing that FSLIC was legally bound by each of its terms and that FSLIC will obtain all approvals and authorizations necessary to perform its obligations under the agreement. *See* Compl., Ex. 2 at 23, in *LaSalle Talman Bank, FSB v. United States*, No. 92–652C (Fed.Cl.) ("*LaSalle Talman* Compl. Ex. 2"). The Financing Agreement also required FSLIC to execute an Agreement Regarding Goodwill, which was attached to the Financing Agreement and incorporated by reference. The Financing Agreement between plaintiff and FSLIC stipulated that "the parties will exchange a signed agreement in the form of Exhibit C [the Agreement Regarding Goodwill] relating to the amortization of [plaintiff's] goodwill, with such changes in such Exhibit as the parties may approve." *Id.* at 15.

The Financing Agreement used explicit contract language. In Section 4.02 of the agreement, the document stated: "FSLIC hereby makes to [plaintiff] the representations and warranties set forth in the following subsections of this Section, all of which shall survive the execution and delivery of this Agreement and the Closing." *LaSalle Talman* Compl. Ex. 2 at 34. Another provision stipulated that "[t]his Agreement constitutes a legal, valid, and binding agreement of FSLIC, enforceable against FSLIC in accordance with its terms." *Id.* Finally, the Agreement recorded that each party to the Agreement committed to indemnify the other party in case of breach. *Id.* at 36.

The Agreement Regarding Goodwill provided for a $100 million reduction in the total goodwill carried on plaintiff's books, recognized the remaining goodwill as reflected in plaintiff's financial statements, and expressly set forth a 30–year amortization period for that goodwill. *LaSalle Talman* Compl. Ex. 2 at Ex. C. At the time it executed the Agreement Regarding Goodwill, plaintiff's financial statements reflected approximately $609 million in goodwill.

Thus, plaintiff in *LaSalle Talman* produced documents that reflected the Government's specific intent to be contractually bound by the terms of the agreements. The language of the agreement documents reinforced the existence of mutuality of intent with regard to the transactions. The reference by the Federal Circuit to agency documents as constituting a binding contract contemplates documents that meet a high standard in scope and contract language by expressly manifesting a commitment by the Government to be contractually bound. The *LaSalle Talman* decision cannot be read to christen all agency documents as contracts simply because they were executed in the *Winstar* context.

The Supreme Court in *Winstar III* cautioned: "Contracts like this are especially appropriate in the world of regulated industries, where the risk that legal change will prevent the bargained-for performance is always lurking in the shadows." *Winstar III*, 518 U.S. at 869, 116 S.Ct. 2432. In fact, *Winstar III* asserted that the thrifts and FHLBB should have "us[ed] clearer language" to "eliminat[e] any serious contest about the correctness of their interpretive positions," *id.* at 869 n. 15, 116 S.Ct. 2432, to overcome the Government's contention that the change in regulation did not constitute a breach of contract. The Supreme Court remarked: "The failure to be even more explicit is perhaps more surprising here, given the size and complexity of these transactions." *Id.* This is not language that anticipates situations in which the parties failed to memorialize their negotiations or contract terms other than as reflected in routine agency documents.

Citizens' case differs in an important way from *Winstar III*, *CalFed* and *LaSalle Talman:* Citizens' mergers and acquisitions were all unassisted transactions. As such, Citizens did not receive cash from the Gov-

ernment in connection with the mergers and acquisitions. For this reason, the court would not expect that the parties in the case at bar necessarily would have signed a single written agreement encompassing their entire understanding with respect to each transaction. At the same time, however, the Federal Circuit has not dispensed with the requirement that the parties produce a written memorialization of their commitment. Moreover, nothing in *Winstar III* restricts its analysis to assistance agreements. Finally, the supervisory goodwill in this case was provided in lieu of a cash infusion. Thus, the consideration in dispute was no less valuable in the regulatory context than the cash provided in assisted transactions. All the post-*Winstar III* cases therefore share a common question: What evidence should be required to establish a commitment to provide something of value within the regulatory framework, along with the concomitant commitment not to regulate in contravention of that agreement?

Because this case is the first trial of *Winstar* claims, it represents the first occasion that the court has scrutinized the documents presented by a thrift or its successor under the rules of evidence. Examination of the documents introduced reveals that even regulatory documents, such as Bank Board Resolutions, vary greatly in content from case to case.

All four Resolutions in the case at bar employ substantially the same language. All four Resolutions consist of two pages. Each recited that the documentation associated with the application had been reviewed and deemed eligible for approval "under applicable provisions of statute, regulation, and Bank Board policy." *See* Bank Board Resolution V–O–M–82–7, Apr. 30, 1982, at 1 (approving Cardinal transaction).[14] Each of the four documents resolved that the transaction in question was approved, pursuant to section 546.2 of the Federal Regulations, provided that the provisions of the Resolution were complied with "in a manner satisfactory to the Supervisory Agent of the Federal Home Loan Bank of Cincinnati within 120 days of the date of this Resolution." *Id.* All four Resolutions required that Citizens submit evidence that it had given written notice of the merger to each investor with deposits larger than $100,000.00. *Id.* The Resolutions also required that Citizens submit to FHLBB an opinion from its independent accountant that indicated the justification under GAAP for use of the purchase method of accounting; specifically described any goodwill arising from the purchase; and substantiated the reasonableness and amounts of goodwill generated and the related amortization period. *Id.* The Resolutions required that Citizens submit an opinion letter from local counsel stating the effective date of the acquisition and confirming that it was consummated in accordance with the relevant Purchase Agreement; a statement of the financial condition of Citizens and a closing statement of the acquired institution as of the acquisition; and a letter signed by the CEO of both institutions stating that the acquisition was consummated consistent with the pro forma statement of condition. *Id.*

In *Bank of America, FSB v. United States,* 55 Fed.Cl. 670 (2003), a decision finding liability on summary judgment, plaintiff relied on the Bank Board Resolution governing the acquisition in question to show the existence of a contract. The opinion in that case quotes the Resolution at length:

"WHEREAS, the [Bank] Board has determined that the acquisition of Honfed is resolving a supervisory problem, for the purposes of the preceding conditions 5 and 6 [describing, respectively, a net worth maintenance requirement and a dividend payout limitation] for the Honfed acquisition, and for Honfed's compliance with the requirements of Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, from the date of [plaintiff's] acquisition of Honfed until Honfed's 1996 fiscal closing date, the [Bank] Board hereby agrees to forbear from initiating supervisory action against Honfed as a result of its failure to meet the net worth requirements of Section 563.13(b) *provided* that

---

14. *See also* Bank Board Resolution V–O–P–83–2, Feb. 25, 1983 (approving Gateway transaction); Bank Board Resolution V–O–M–84–2, Feb. 23, 1984 (approving Homestead transaction); Bank Board Resolution V–O–M–85–7, July 18, 1985 (approving First Federal transaction).

Honfed maintains a net worth-to-total liabilities ratio (as defined below) equal to, or greater than, the [listed schedule of specifically negotiated ratios]."

55 Fed.Cl. at 675 (alterations in original). The Resolution thus contained specific contract terms by which the Government pledged that it would forbear from enforcing the net worth requirements contained in the Rules and Regulations for Insurance of Accounts. The Resolutions in the case at bar contain no such promise.

Although defendant argued in *Bank of America* that the Resolution language was "nothing more than an expression of regulatory policy," the court concluded that the Resolution language conveyed "words of commitment." 55 Fed.Cl. at 675. "In them, we find described both the circumstance that prompted the government to act (the need to resolve a supervisory concern) and the details of the bargain that was struck . . . ." *Id.* None of the documents introduced by plaintiff in this case includes language approaching the commitment to which FHLBB bound itself in *Bank of America.*

Complementing its reliance on agency documents, plaintiff relies on the testimony of its witnesses—principally Messrs. Kirby, Muldoon, McElheney, and Thiemann. Although Mr. Kirby testified that, at the time of each of the four transactions, he believed that he was entering into a contractual relationship with the Government, his actions do not bear out that characterization of the events. Mr. Kirby provided more than 15 hours of testimony. The parties took ample time to probe the witness's testimony; his direct and cross-examinations fairly can be called exhaustive. The picture that emerged of Mr. Kirby over the course of the trial is of an intelligent and highly competent businessman. Mr. Kirby spent his career in the banking industry, having joined Citizens as a bank teller in 1954. Through the years he moved up to the position of head teller, then Manager, Assistant Vice President, and Vice President. In May 1973 he was elected by the board of directors to be the President and CEO of Citizens. In 1979 he became Chairman of the Board, as well. Mr. Kirby remained with Citizens for his entire career and joined plaintiff upon Citizens' sale in 1998. He served as Chairman of the Board of plaintiff until his retirement in 2001.

In 1984 Citizens became only the second thrift in the country to start a trust department. Citizens was the second thrift in the country to computerize its deposit accounts, mortgage accounts, and general ledger. Citizens also exhibited shrewd business policies, refusing to extend mortgages with terms longer than 20 years. Citizens maintained capital in excess of its regulatory requirements in the early to mid–1980's. Mr. Kirby led the institution through the savings and loan crisis of the 1980's, and, despite the hurdles imposed by FIRREA, Citizens was a profitable institution at the time of its sale to plaintiff.

The court has no reason to question Mr. Kirby's integrity and veracity; his testimony was consistent, and his demeanor on the stand betrayed no hesitation about the nature of the arrangements with Mr. Muldoon. Nevertheless, more than 20 years have passed since the first transaction. Mr. Kirby's recollection of the events was almost rote; he testified with certitude that he had the same interaction with Mr. Muldoon regarding each of the four transactions—that he requested cash of Mr. Muldoon, but was offered supervisory goodwill treatment instead; that Citizens could book this goodwill as an asset; and that Citizens could use it as regulatory capital over an extended period of time. Mr. Muldoon, on the other hand, could testify only in somewhat more general terms.

Because Mr. Kirby is such a capable businessman, the court cannot reconcile his certitude about the contractual nature of his agreements with Mr. Muldoon with the fact that Mr. Kirby acted in a most un-businesslike manner with regard to the four supervisory transactions in this case. Mr. Kirby himself stated that the transactions would have put Citizens immediately out of capital compliance had they not been supported by the special goodwill treatment. Indeed, plaintiff contends that Citizens would have been "virtually insolvent" following the first transaction and all the transactions thereafter had Citizens not been able to make use of the supervisory goodwill. *See* Pl.'s Br. filed

Jan. 6, 2003, at 45. The mergers and acquisitions would have been "capital suicide" without his agreements with Mr. Muldoon. Tr. at 304. However, he also testified that Mr. Muldoon "never, ever said anything about an ironclad guarantee, but when he said that we could amortize that goodwill over an extended period of time and for regulatory purposes, I took him at his word, that that was the policy." Tr. at 605.

Plaintiff is insistent that both Messrs. Kirby and Muldoon were persons of integrity. Mr. Muldoon spoke to Mr. Kirby's integrity, as did Mr. McElheney. Mr. Thiemann attested to Mr. Muldoon's integrity. The court credits fully the integrity of these gentlemen. Mr. Kirby thought that Citizens had contracts with the Government. Messrs. Muldoon, McElheney, and Thiemann all thought that FHLBB had entered into contracts and that FHLBB made a commitment to recognize goodwill for regulatory purposes that could not be withdrawn. However, no one—not one witness for plaintiff—testified that commitments were made on behalf of the Government that the Government would not change the policy of allowing goodwill to count as regulatory capital. Mr. Kirby did not ask for such assurance; he assumed it. Even were the court to find in the witnesses' testimony the requisite specificity to establish express oral contracts—which it does not—the court could not recognize contracts in the context of a *Winstar* case that ultimately rest on oral commitments alone, without the reinforcement of written agreements.

The Supreme Court in *Winstar III* was emphatic in its discussion of the terms that had been reduced to writing. The commitments were so unusual, far-reaching, and crucial to the institutions' continued viability that, of course, they were reduced to writing. The only grist for the legal mill was the specificity of the writings. *CalFed* diluted somewhat the rigor of *Winstar III* by looking at the totality of written and oral evidence to find an implied-in-fact contract, but it did not abandon the requirements of a specific commitment in writing reinforced by oral testimony. This case rests principally on oral and deposition testimony, but the agency documents, which are relied on to reinforce and corroborate the testimony, are themselves truly routine.

The court cannot understand why Mr. Kirby would not request that FHLB–Cincinnati confirm such critical agreements in writing, especially considering that at least one of the agreement terms ostensibly extended over the course of 30 years. Citizens requested and received net worth forbearances in writing for each transaction and yet did not make the same request regarding goodwill treatment. Of greatest significance to the court, Mr. Kirby did not explain his arrangements with Mr. Muldoon to his own board of directors. Mr. Kirby testified that he discussed the goodwill treatment separately with three members of the board of directors, but never made a presentation to the board of directors and did not record his informal discussions. When asked why he acted in such a manner, Mr. Kirby's response was that the three "directors that I counseled with regularly [had the opinion] at that time that the treatment of supervisory goodwill was something that most of the board might not understand ...." Tr. at 686–87.

This cavalier approach stands in stark contrast to evidence gleaned from a decade's worth of board minutes presented at trial. These minutes reveal that the Citizens board discussed complex financial and legal matters at length and in detail, including the nuances and timing of a stock conversion, as well as acquisitions and mergers with other financial institutions and thrift branches over the course of many years.

Furthermore, Mr. Kirby testified that in 1986, to Citizens' detriment, the thrift accelerated one goodwill amortization period from 30 years to 25 years. Yet, if Mr. Kirby considered the goodwill treatment as a contractual obligation, he would not unilaterally have changed the terms of that agreement without at least discussing the amendment with FHLBB representatives.

The accounting convention used in these transactions—the purchase method—could not predict with absolute certainty the amount of goodwill that would result from each transaction. Because the assets were valued at fair market value on the day of the transaction, the goodwill was marked to mar-

ket on that day and accounted for accordingly. While the impossibility of knowing the exact amount of goodwill does not foreclose the existence of contracts, it does reinforce the importance *ex ante* of Citizens' asking for as much of the agreements as possible in writing. Mr. Kirby testified that, when he discussed the goodwill arrangements with his management group and Citizens' attorney, Mr. Curp, no one suggested obtaining the understandings in writing, even though the arrangements could span the course of 30 years, involved millions of dollars in assets, and could cause Citizens to fall out of capital compliance. Remarkably, at no time did Citizens even contemplate putting the agreements into writing.

The only conclusion that reconciles Mr. Kirby's words, actions, experiences, and customary business practices is that he himself did not believe that his agreements with Mr. Muldoon constituted contracts. No evidence suggests that he used contract language at the time to describe the agreements. Mr. Kirby did not make any request of FHLB–Cincinnati for forbearance letters regarding the goodwill treatment; he also did not approach his own board of directors to discuss the ramifications of the new arrangements that he was undertaking with Mr. Muldoon. Mr. Kirby, at the time of the transactions in question, did not treat his arrangements with Mr. Muldoon as contractual; did not have the prescience to consider that the regulatory treatment might be withdrawn; and did not in any way make outward manifestations indicating that contractual relationships existed.

The court cannot over-emphasize the key premise upon which the Supreme Court in *Winstar III* grounded its decision that the Government made a binding promise to those plaintiffs. The Court stated:

> It is important to be clear about what these contracts did and did not require of the Government. Nothing in the documentation or the circumstances of these transactions purported to bar the Government from changing the way in which it regulated the thrift industry. Rather, what the Federal Circuit said of the Glendale transaction is true of the Winstar and

Statesman deals as well: 'the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected' in the agreements between the parties. We read this promise as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence.

518 U.S. at 868–69, 116 S.Ct. 2432 (quoting *Winstar II*, 64 F.3d at 1541–42) (citation and footnote omitted). Thus, the essence of the alleged contracts is a promise by the Government not to change the regulation governing goodwill treatment. However, although Messrs. Kirby, Muldoon, McElheney, and Thiemann generally regarded FHLBB as having made commitments, their testimony on the firm expression that they would not be withdrawn, changed, or superseded is general and impressionistic. Their testimony does not present sufficient evidence to establish the existence of contracts.

The court has no power to predicate four contracts merely on the ground that the goodwill treatment in each case was a but-for condition of the transaction. Nor can it infer contracts from the testimony of the two parties' representatives, Messrs. Kirby and Muldoon, that they were entering into contracts, when documentary evidence contemporaneous with the transactions suggests that is not the case. The law requires an explicit manifestation of intent to contract, and the transactions that plaintiff presents lack this element.

This is a classic case of unadorned, non-customized agency documents. Plaintiff presented voluminous documentation regarding each transaction, which plaintiff insists reflects negotiation and agreement of contract terms. Although the discussions were not extensive, the court generously could characterize them, for purposes of argument, as negotiations for goodwill treatment. Plaintiff presented the many documents—regulatory and otherwise—stating the amount of goodwill and its period of amortization as evidence of contractual terms. Even having proven, *arguendo*, the existence of negotia-

tion and terms, plaintiff has failed to show that it treated the agreements as contractual relationships that would withstand a change in government policy.

In all four transactions, Citizens requested and obtained forbearance letters—not regarding the accounting treatment, but rather allowing Citizens to exclude the capital gained from each transaction from its regulatory calculation. Citizens' transactions therefore are one step removed from that recognized in *CalFed*. Not only do they lack integration clauses, they also lack contemporaneous written documents memorializing the parties' alleged agreements. Among Citizens' scores of memoranda, correspondence, and board minutes, no document, not even so much as a written phone record, contains the terms of the agreements. The only documents that reflect the terms of the goodwill treatment—both amount and amortization period—are the routine agency documents, which, without more, do not themselves rise to the level of a contract.

One document that uses anything approaching contract language came four years after the consummation of the last transaction in question and months before the enactment of FIRREA. A March 10, 1989 letter from Citizens' board of directors to Nicholas F. Brady, Secretary of the Treasury, cautioned that the proposed change to goodwill treatment would be "extremely damaging and grossly unfair to Citizens." The letter then stated: "Unless ... 'FIRREA' is amended to grandfather Goodwill existing as a result of eight Supervisory transactions negotiated in good faith on the part of Citizens, then Citizens shall deem [FIRREA] to be an impairment to the contractual obligation of agencies of the United States Government, and also a breach of contract pursuant to contract law ...." This letter is remarkable because it is the first written indication that Citizens treated its arrangements with the Government as a contract. However, a unilateral, *ex post* expression of contract cannot contractually bind the Government. This letter apparently was the product of a nationwide lobbying effort by the thrift industry against FIRREA, not a product of Citizens' own initiative.

The enduring principle of contract law is that, if the parties were making an effort to contract against the possibility of a change in policy, it was incumbent on at least one of the parties to document the commitment. In this case, given the amount of money involved, the ramifications of the transactions to Citizens' viability, and the importance of long-term amortization to allow Citizens to remain profitable, the evidence shows a new FHLBB policy implemented at the regional level to stave off bank failures by encouraging—through purchase method accounting, coupled with long-term amortization—healthy banks to merge with or acquire branches of failing thrifts. The evidence shows the existence of a national policy and that it was implemented. However, plaintiff has failed to show evidence of a contract whereby the Government committed not to change the regulatory underpinnings of their arrangement.

As discussed above, the Supreme Court in *Winstar III* held that courts deciding *Winstar*-related cases should apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." *Winstar III*, 518 U.S. at 871, 116 S.Ct. 2432. The witnesses who testified at trial proved, at best, handshake agreements. It is this court's firm conviction that the Supreme Court never would have countenanced the consequences to the Federal Government of being bound to a contract not to regulate, *i.e.*, not to withdraw its approval of these transactions, based on agreements of this nature. Aware as it is that other thrifts in the same position successfully have claimed the existence of a contract, the court acknowledges the inconsistency of not according similar treatment to Citizens. As long as customary principles of contract law apply, however, the Citizens transactions cannot be called contracts.

## CONCLUSION

Accordingly, based on the foregoing,

1. Defendant's motion for judgment on partial findings, pursuant to RCFC 52(c), is granted as to liability and is otherwise denied.

2. The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**